*park*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RICKEY M. SMITH,              )
                              )
          Plaintiff,          )
                              )  Case No. 10 C 6597
                              )
     v.                       )  Magistrate Judge Arlander Keys
                              )
MICHAEL ASTRUE, Commissioner  )
of Social Security,           )
                              )
          Defendant.          )

## MEMORANDUM OPINION AND ORDER

### A. Factual Background

1. Procedural History

On March 8, 2006, Plaintiff Rickey Smith applied for Supplemental Security Income. Record at 63. He alleged that he became disabled and unable to work on March 16, 2004 because of leg and hip pain, manic depression, and bipolar disorder. Record at 295. The Social Security Administration initially denied Mr. Smith's application on June 8, 2006 and denied it again upon reconsideration on November 29, 2006. Record at 63. Mr. Smith requested a hearing before an Administrative Law Judge. *Id.* Administrative Law Judge E. James Gildea convened the hearing on May 12, 2008, in Orland Park, Illinois. *Id.* Both Mr. Smith and Edward F. Pagella, an impartial vocational expert, testified at the hearing. *Id.*

On November 18, 2008, the ALJ issued an opinion denying Mr. Smith's claim. *Id.* The ALJ found that, while Mr. Smith did have

severe mental and physical impairments, they did not meet the criteria of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Record at 66-67. He also found that, based on Mr. Smith's residual functional capacity, age, education, and work experience, he was capable of performing light work as defined in 20 C.F.R. § 416.967(b). Record at 67-70.

Mr. Smith appealed the ALJ's decision, and, on August 13, 2010, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Mr. Smith then filed this lawsuit on October 14, 2010, seeking review of that decision. The parties consented to proceed before a United States Magistrate Judge, and the case was assigned to this Court on January 21, 2011. The parties then filed cross motions for summary judgment. Mr. Smith seeks reversal or remand, contending that the ALJ (1) failed to properly evaluate his credibility or residual functional capacity; (2) failed to properly evaluate the opinion of his treating doctor; and (3) failed to account for deficiencies in his concentration, persistence, or pace. The Commissioner disagrees, and asks this Court to affirm the decision to deny benefits.

2. Proceedings Before the ALJ

At the hearing before the ALJ, Mr. Smith, then 38 years old, appeared and was represented by counsel. He testified that he is 5'1" and weighs 150 lbs. Record at 16. He testified that he is

single and lives with his sister and her two children, who were nineteen and seventeen years old at the time. Record at 16-17. He stated that he has never had a driver's license and has always lived with family. Record at 17, 35. When asked whether he was receiving income from any source, Mr. Smith testified that he was solely receiving $162 worth of food stamps each month. Record at 17-18. He also testified that he had always been enrolled in special education classes and was able to finish the ninth grade at Joliet West High School. Record at 37, 18. Mr. Smith further asserted that he took a G.E.D. class while in prison; however, he never passed the test. Record at 37-38.

In regards to his past work experience, Mr. Smith testified that he believes he was last employed in 1999 at Burger King as a cook. Record at 18. When asked how long he was employed with Burger King, he testified "I'm not for sure, but I think it's two months." Record at 19. Mr. Smith later recalled working at a warehouse for about 60 days sometime around 2002, in which he made wires and plugs. Record at 34. He testified that he has not held any other employment since 1989, as he was convicted of murder and incarcerated from 1986 to 1996 at Dixon Special Treatment Center. Record at 19-20. While incarcerated, he worked as a janitor and was in charge of mopping and sweeping the dining area. Record at 29.

Regarding hospitalizations within the last five years, Mr. Smith testified that he underwent surgery in 1999 for a gunshot wound to his right leg, and then in 2006, he was hit by a truck and had to have surgery for his left leg. Record at 41. He stated that he has steel rods and bolts in both legs but that he used a cane even before he was hit by the truck. Record at 23, 41. He also testified that when he got hit by the truck, the bolts from the older injury on the right leg snapped. Record at 44. He further asserted that he had been hospitalized at St. Joseph's Hospital for about three days in August 2006 for attempted suicide. Record at 24.

Mr. Smith also testified that he was taking five different prescription medications, and although he could not remember the names of all five medications, he knew that he took one for bipolar disorder, "one for paranoid schizophrenia, and one for hearing voices." Record at 20-21. He testified that Dr. Navakas prescribed him these medications and that he sees him about every three weeks for about an hour. Record at 21-22. He explained that he also sees a therapist right after he meets with Dr. Navakas. Record at 33.

Mr. Smith testified that he was not taking any medications for his physical problems. Record at 21. When asked how he was able to get medication for his mental health and not the pain

associated with his physical injuries, Mr. Smith testified that he did not have a medical card but could get samples of [pain relievers] from the Will County Mental Health Department. Record at 45. He further testified that he takes some of his medication in the morning and some at bedtime. Record at 22. He stated that he takes Risperdal in the morning and that Dr. Navakas also had him taking Ritalin. *Id.* He testified that he had been on these medications since 2006, with no complications, except shaking and drying of the mouth and throat. Record at 22-23. He testified that he has never been treated for any substance or alcohol abuse. Record at 30.

Mr. Smith also testified that, within the last year, he tried to support himself by cutting grass and shoveling snow. Record at 35. When asked to speak more about this, he testified that "it wasn't easy" and that he would have to stop, sit, and then go back to what he was doing until it was finished. Record at 36. He claimed that he has not worked much since being hit by a truck. *Id.*

Mr. Smith testified that, during the day, he helps out around the house by sweeping and taking out the garbage. Record at 24. Sometimes he polishes the tables, mops the floor, and cleans up the bathrooms and laundry room. Record at 28. He also testified that he generally gets around four or five hours of

sleep each night. Record at 24. When asked what he does during the nineteen or twenty hours he is awake, Mr. Smith testified that he watches television, sits on the porch, and speaks with friends. Record at 25. He testified that sometimes he leaves the house and tries to walk a bit along a track for five to ten minutes. Record at 25-26. He testified that sometimes his friend walks with him but that he has to stop and sit once his legs and back start to bother him. Record at 26.

In regards to entertainment, Mr. Smith testified that he eats at McDonald's and Burger King about three times a week with his sister and her children. Record at 26-27. He also testified that he plays cards with his nephew and sometimes listens to music. Record at 27. He stated that he and his sister go to the grocery store and church together. Record at 28. He also testified that he tries to read the newspaper, and if he does not understand something, he asks his sister for help. Record at 29.

Mr. Smith further testified that he does his own laundry once a week in the basement. Record at 27-28. When asked how he handles the stairs leading down to the basement when he does his laundry, Mr. Smith testified that his room is in the basement and that he otherwise uses his cane to get up and down the stairs. Record at 39-40. He stated that, because of his depression, he

sometimes stays in the basement for two or three days continuously. Record at 40.

Finally, Mr. Smith testified that he was recently in jail for domestic battery, but his sister dropped the charges. Record at 45-47. He testified that he has since been attending anger management classes every Wednesday. Record at 47.

After Mr. Smith, the ALJ heard from Edward Pagella, a vocational expert (VE). The ALJ immediately asked the VE to assume a hypothetical younger individual with a limited education and no past relevant work has the residual functional capacity to perform work at the light exertional level, which does not require climbing ladders, ropes, scaffolds, or more than occasional climbing of ramps and stairs. Record at 49. The ALJ continued and asked whether this hypothetical person would be able to perform work that does not require more than occasional stooping, crouching, crawling, and not more than frequent balancing or kneeling, which does not require the performance of more than simple, unskilled tasks and more than occasional work in close proximity to coworkers or the general public. Record at 50. The VE testified that this hypothetical person could perform occupations within the manufacturing industry- notably the work of hand assemblers, packagers, and sorters. *Id.* The VE further testified that he would not recommend any unskilled service or

clerical occupations, as this would require more than occasional interaction with the general public and/or coworkers. *Id.*

Finally, the ALJ asked whether there were any jobs for this same individual at the sedentary exertional level. *Id.* The VE testified that he would recommend the same type of manufacturing occupations. *Id.* The VE also testified that these sedentary jobs would allow for a sit/stand option within 30-minute to an hour intervals. Record at 50-51.

3. Medical Records Before the ALJ

In addition to the testimony of Mr. Smith and the vocational expert, the ALJ considered Mr. Smith's medical records from the relevant period - both with respect to his physical injuries and his mental impairments. The medical records demonstrate that Mr. Smith fractured his left femur on February 19, 2006 and underwent surgery the next day at Silver Cross Hospital in Joliet, IL. Record at 279. According to Dr. Paul Trksak's medical reports, Mr. Smith fractured his left femur when he was struck by a car; he also suffered some abrasions to his chin and left hand. *Id.* His physical examination revealed shortening and external rotation of the lower left leg and moderate swelling of the left thigh. *Id.* There was no tenderness upon palpation around the left knee, leg, ankle, or foot. *Id.* He was also able to flex

and extend his toes. *Id.* The x-rays revealed a traverse fracture of the mid shaft of the left femur. *Id.*

Additionally, Mr. Smith complained of pain in his right thigh and stated that he heard a "pop" when he fell. *Id.* X-rays of his right leg revealed multiple metallic fragments consistent with a previous gunshot wound. *Id.* Although the distal screw in his right leg was broken, the positioning of the rod and healed fracture led Dr. Trksak to suspect that the broken screw was old or not the result of the pedestrian auto accident. *Id.* Otherwise, the fracture to his right femur was healed and had an interlocking nail present. *Id.* Dr. Trksak also recommended inserting an interlocking nail into his left femur. *Id.* Mr. Smith underwent surgery for his left leg on February 20, 2006. *Id.*

According to the progress notes, dated March 23, 2006, the x-ray revealed satisfactory alignment and healing of the left fracture and minimal callus formation. Record at 283. The progress notes also indicated that Mr. Smith had no new complaints, except some discomfort and occasional numbness in his hands and wrists. *Id.* His wounds were otherwise well healed and the staples were removed. *Id.* The doctor's general impression was that Mr. Smith was doing well overall; however, he cautioned him against putting too much weight on his injured left leg. *Id.*

9

On October 28, 2006, Mr. Smith underwent an SSA consultative examination in which the doctor noted that he was able to walk less than a block, with a cane, before experiencing pain in his legs. Record at 355. The doctor also determined that Mr. Smith was able to stand for 45 minutes and sit for five to six minutes before he felt pain in his back. *Id.*

With regard to Mr. Smith's mental impairments, there is little in the way of medical records dating from the time period in which Mr. Smith alleges he became disabled; however, Mr. Smith previously applied for disability and underwent a disability exam on August 11, 2005. Record at 290. At the time, he was 35 years old and was not taking any medications. *Id.* He claimed disability because of right leg and hip pain, which caused him ambulatory difficulties. *Id.* At that point he was not using an assistive device, and he denied ever being hospitalized for psychiatric reasons or having emotional or psychiatric problems. Record at 290-91.

On May 18, 2006, Mr. Smith underwent a consultative psychological examination with Dr. Erwin Baukus. Record at 295. Mr. Smith walked into the office that day using a four-point cane and attributed his abnormal gait to his problems with balancing and pain. *Id.* His posture reflected discomfort, but he was "cooperative, open, and submissive." Record at 296. During this

examination, Mr. Smith reported that, other than a SSA Consultative Examination from a year earlier and psychiatric treatment while he was incarcerated, he had never seen a mental health professional for any treatment. *Id.* He also had no history of either alcohol or drug treatment. *Id.*

Additionally, Mr. Smith reported symptoms of depression, including loss of interest in almost all activities; sleep disturbance; decreased energy; feelings of guilt and worthlessness; difficulty concentrating; and thoughts of suicide. Record at 297. He also reported feeling pain all over and severe headaches. *Id.* He was not taking any medications at the time of this examination; however, he had been prescribed Xanax less than a month earlier. Record at 296.

Dr. Baukus diagnosed Mr. Smith with adjustment disorder and depression. Dr. Baukus also diagnosed Mr. Smith with pain associated with his motor vehicle accident and prior gunshot wound. Record at 299. He found no evidence that Mr. Smith was experiencing ego alien hallucinations or delusions during the examination. Record at 298. Mr. Smith was able to repeat six digits forward but not four digits backward. *Id.* He was able to relate current news and name four U.S. presidents from the last fifty years. *Id.* Mr. Smith was also able to name three large cities in thirty seconds and five current famous people in twenty

seconds. *Id.* He had difficulty performing calculations and engaging in abstract thinking. *Id.* Dr. Baukus ultimately suggested that Mr. Smith would not be able to manage his own funds if benefits were awarded. Record at 299.

On August 19, 2006, Mr. Smith was hospitalized at St. Joseph's Hospital in Joliet, IL for attempting suicide. Record at 355. He started seeing Dr. Navakas on September 28, 2006; at that initial appointment, he complained of depression, suicidal thoughts, lack of sleep, isolation, and visual and auditory hallucinations. Record at 389. Dr. Navakas then diagnosed Mr. Smith with schizophrenia, paranoid type. *Id.* He prescribed Paxil and Risperdal, and by September 30, 2006, Mr. Smith was taking these two medications and Advair as needed. Record at 390 and 376. Dr. Navakas also indicated that Mr. Smith demonstrated moderate limitation in activities of daily living and social functioning and marked limitation in his concentration, persistence, and pace. Record at 390. He also indicated that Mr. Smith had one episode of decompensation within the past year. *Id.*

Dr. Navakas's progress notes, dated October 30, 2006, showed that Mr. Smith did not complain of delusions, sleep problems, or appetite loss or gain. Record at 377. Mr. Smith said he felt "ok" and "a little better this month." *Id.* Progress notes from

February 7, 2008 demonstrate that Mr. Smith denied symptoms of audio or visual hallucinations and delusions. Record at 381. In this same progress note, Dr. Navakas listed the five medications he had prescribed to Mr. Smith. *Id.*

4. The ALJ's Decision

In a decision issued on November 18, 2008, the ALJ found that Mr. Smith was not disabled within the meaning of the Social Security Act. Record at 63. In making this determination, the ALJ applied the five-step sequential analysis prescribed by the Act.

At step one, the ALJ determined that Mr. Smith had not engaged in substantial gainful activity since March 8, 2006 (the date of his application). Record at 65.

At step two, the ALJ concluded that Mr. Smith had a number of severe impairments, including adjustment disorder, major depressive disorder, and residual effects of a leg fracture. *Id.* The ALJ also noted that, in an October 30, 2006 physical assessment report, Mr. Smith was diagnosed with schizophrenia, after he reported having suicidal thoughts, decreased sleep, self-isolation, and visual and auditory hallucinations. *Id.* The ALJ further noted that Mr. Smith underwent surgery to his right leg in 1999 and again in February 2006 for his left leg, after he had reported being hit by a pickup truck. Record at 65-66.

At step three, the ALJ found that, despite these conditions, Mr. Smith had no impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Record at 66. After first considering Mr. Smith's mental impairments, the ALJ determined that Mr. Smith had mild restrictions in activities of daily living, moderate difficulty in social functioning, and moderate difficulty in concentration, persistence or pace. *Id.* In support of this conclusion, the ALJ noted Mr. Smith's statements that he had lived with friends, could perform some household chores, and attended church. *Id.* The ALJ further explained that, although Mr. Smith stated that he needed help remembering to take his medication, he also said that he only had problems with concentration when it was too loud. *Id.* Finally, the ALJ cited to a lack of evidence in the record that Mr. Smith experienced any significant mental breakdowns requiring hospitalization or treatment for sudden decompensation. *Id.* The ALJ next concluded that, with respect to Mr. Smith's leg fracture, the evidence did not indicate that he was unable to move effectively without the use of an assistive device. Record at 67.

At step four, the ALJ determined that Mr. Smith had the residual functional capacity to perform light work. *Id.* The ALJ first considered Mr. Smith's statements alleging that he was

14

suicidal, depressed, and had difficulty concentrating. Record at
68. He also acknowledged Mr. Smith's reported difficulty in
dressing and getting in and out of the tub. Record at 67.
Despite the ALJ's finding that Mr. Smith's medically determinable
impairments could reasonably be expected to cause these symptoms,
he concluded that Mr. Smith's statements were not credible due to
inconsistencies with his residual functional capacity assessment.
Record at 68. After briefly summarizing Mr. Smith's medical
records, the ALJ credited Dr. Baukus's report, which explained
that, although Mr. Smith appeared depressed, there was no
evidence of hallucinations or delusions, he was alert, and his
psychomotor agitation was within normal limits. Record at 68.
Lastly, the ALJ considered Mr. Smith's complaints of leg and back
pain, and credited an October 28, 2006 doctor's report, which
noted that Mr. Smith was only able to walk about fifty feet
before needing support. *Id.*

Based on the vocational expert's testimony, the ALJ
concluded, at step five, that Mr. Smith would be able to perform
jobs that exist in the national economy in significant numbers.
Record at 70.

## B.   **Discussion**

To be entitled to benefits under the Social Security Act, a
claimant must be "disabled" within the meaning of the Act- a

determination made using the SSA's five step inquiry. 20 C.F.R. § 404.1520. At step one, the ALJ establishes whether the claimant is employed. At step two, the ALJ determines whether the claimant has a severe impairment. At step three, the ALJ decides whether the impairment meets or medically equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1. At step four, the ALJ ascertains the claimant's "Residual Functional Capacity" and determines whether he can perform his past relevant work. Finally, at step five, the ALJ determines whether the claimant is capable of performing other work that exists in significant numbers in the national economy.

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steel v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Evidence is substantial if a reasonable person would accept it as adequate to support the conclusion. *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or by making credibility determinations." *Skinner v. Astrue*, 478 F.3d 835, 841 (7th Cir. 2007). Should conflicting evidence permit reasonable minds to defer, it is the responsibility of the ALJ, not the courts, to determine if the

claimant is disabled. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

This does not mean that the ALJ is entitled to unlimited judicial deference. The ALJ must consider all relevant evidence and may not select and discuss only the evidence that favors his ultimate conclusion. *Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir. 1985). While the ALJ need not address every piece of evidence in the record, he must articulate his analysis by building an "accurate and logical bridge" from the evidence to his conclusion, so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002). Although the plaintiff bears the burden of demonstrating his disability, it is a "basic obligation of the ALJ to develop a full and fair record." *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991). It is not enough that the record contains evidence to support the ALJ's decision. *Steel*, 290 F.3d at 941. Rather, the ALJ must rationally articulate the grounds for his decision. *Id.*

Mr. Smith contends that the Commissioner's decision should be reversed or remanded because the ALJ (1) failed to properly evaluate his credibility or residual functional capacity; (2) failed to properly evaluate the opinion of his treating doctor;

and (3) failed to account for deficiencies in his concentration, persistence, or pace. For the reasons discussed below, the Court remands this matter for further proceedings.

### 1. The ALJ's Credibility Determinations

Mr. Smith first argues that the ALJ did not properly account for all of his limitations, and that the ALJ failed to include his need to use a cane in either the Residual Functional Capacity assessment or the hypothetical questions to the vocational expert. In response, the Government argues that, according to the record evidence, Mr. Smith does not use a cane for anything other than to climb up and down stairs. The Court disagrees.

Ordinarily, a hypothetical question to the vocational expert must include all limitations supported by medical evidence in the record. *Steele*, 290 F.3d at 942; *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004). It is important for the vocational expert to understand the full extent of the applicant's disability so that the expert does not declare the applicant capable of undertaking work in the national or local economy that the applicant cannot truly perform. *Id.* The hypothetical need not include every physical limitation, provided that the vocational expert had the opportunity to learn of the applicant's limitations through, for example, an independent review of the medical records or through other questioning at the hearing. *Id.*

Nevertheless, where the hypothetical does not include all of the applicant's limitations, there must be some amount of evidence in the record indicating that the vocational expert knew the extent of the applicant's limitations. *Id.*

Here, Mr. Smith testified that he used a cane before he sustained the injury to his left leg in February 2006, and that he had trouble walking even before he was hit by the truck. Record at 41-42. He also testified that he carried his cane everyday because sometimes his "legs go out." Record at 44. The medical records reflect that, in May 2006, Mr. Smith underwent a psychological examination, and he walked into the office that day using a four-point cane. Record at 295. Mr. Smith also underwent an SSA consultative examination on October 28, 2006, in which the doctor noted that he was able to walk less than a block, *with a cane*, before experiencing pain in his legs. Record at 355.

Before posing the hypothetical question to the vocational expert, the ALJ made the following statement: "please disregard any information you may have gathered from reading the file or listening to the testimony other than that which I give you specifically in the hypothetical." The ALJ then asked the VE to assume a hypothetical younger individual with a limited education and no past relevant work, who has the residual functional

capacity to perform work at the light exertional level, which does not require climbing ladders, ropes, scaffolds, or more than occasional climbing of ramps and stairs. Record at 49. The ALJ then asked a variation of the same hypothetical focused on whether the person would be able to perform more than simple, unskilled tasks and more than occasional work in close proximity to coworkers or the general public. Record at 50. Finally, the ALJ asked whether there were any jobs for this same individual at the sedentary exertional level. *Id.*

When a hypothetical question is fundamentally flawed because it is limited to the facts presented in the question and does not include all of the limitations supported by the medical evidence in the record, the ALJ's decision that a claimant can adjust to other work in the economy cannot stand. *Young*, 362 F.3d at 1005. The medical records and supporting testimony here are clear. Mr. Smith had to use an assistive device during the period in which he alleged disability. But the ALJ told the vocational expert to disregard any information he may have learned from reading the file or listening to the testimony. Record at 49. He was told to consider only what was *specifically* given in the hypothetical, which did not include mention of Mr. Smith's cane use. *Id.* Therefore, the ALJ erred in not taking this into consideration in his Residual Functional Capacity assessment and in the hypothetical questions posed to the vocational expert.

Mr. Smith also alleges that the ALJ improperly evaluated his credibility and erred in concluding, without explanation, that he could perform light and sedentary work. Specifically, Mr. Smith argues that the ALJ failed to explain why he did not believe his testimony that he could neither stand for more than 45 minutes nor sit for 5-6 minutes before feeling pain. Mr. Smith further contends that in making his credibility determinations, the ALJ failed to discuss, in accord with the SSR 96-7p factors, his daily activities and explain whether they could be consistent with his impairments.

Credibility determinations are one step in a two-step process that is prescribed by the regulations for evaluating a claimant's request for disability benefits based on pain. *Aidinovski v. Apfel*, 27 F. Supp. 2d 1097, 1103 (N.D. Ill. 1998) (citing 20 C.F.R. § 404.1529(b), (c); SSR 96-7p). At the first step, the ALJ must determine whether the alleged pain is supported by objective medical evidence that could reasonably produce such pain. *Id.* At the second step, the ALJ must evaluate the credibility of the claimant's subjective statements as to the intensity, persistence, and functionally limiting effects of such pain. *Cichon v. Barnhart*, 222 F. Supp. 2d 1019, 1026 (N.D. Ill. 2007).

The ALJ's credibility determinations generally will not be overturned unless they are "patently wrong." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). While the ALJ is in the best position to judge the claimant's credibility, absolute deference to the ALJ's decision is unwarranted if he fails to build an accurate and logical bridge between the evidence and the result. *Aidinovski*, 27 F. Supp. 2d at 1102. When the ALJ evaluates the credibility of the statements supporting a Social Security application, he should comply with the requirements of Social Security Ruling 96-7p, which prohibits ALJs from making conclusory credibility determinations. *Steele*, 290 F.3d at 942. ALJ's are required to articulate the reasoning behind their credibility determinations. Id. SSR 96-8p states that "the RFC assessment must include a discussion of why reported symptom-related functional limitations/restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence."

Here, the ALJ found that, although Mr. Smith's medically determinable impairments could reasonably be expected to cause the alleged symptoms, his statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they were "inconsistent with the above residual functional capacity assessment." Record at 68. This boilerplate language, without more, is unacceptable, as it fails

to inform this Court in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that the claimant's complaints were not credible. *See Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012).

In *Bjornson*, the Seventh Circuit found that this conclusory language, drafted by the SSA for insertion into any ALJ opinion, wrongly implies that ability to work is determined first and then used to assess the claimant's credibility. *Id.* at 644-45. In reality, the assessment of one's ability to work often depends on the credibility of his statements concerning the "intensity, persistence, and limiting effects" of his symptoms. *Id.* at 645. Accordingly, the court held that "an applicant's credibility cannot be ignored in determining his ability to work." *Id.* at 646.

In the instant case, the ALJ failed to rationally articulate the reasoning behind his credibility determinations. He never explained why he rejected Mr. Smith's testimony and the opinion from the SSA's own doctor, who noted that Mr. Smith was neither able to stand for 45 minutes nor sit for 5-6 minutes before feeling pain. The ALJ merely found that, with respect to Mr. Smith's leg fracture, the evidence did not reflect that he would be unable to ambulate effectively without the use of a hand-held device. Record at 67. The ALJ offered nothing further in

support of this point. Rather, he went on to find that Mr. Smith exhibited mild restriction in activities of daily living because he had lived with friends and could perform some household chores.

The Seventh Circuit has recently espoused critical differences between activities of daily living and activities in a full-time job: the latter implies less flexibility in scheduling, little help from others, and accountability to a minimum standard of performance.[1] *Bjornson*, 671 F.3d at 647. Mr. Smith testified that he has very little work experience and depends on his sister for both shelter and transportation. Yet the ALJ never acknowledged these statements and relied solely on two answers from Mr. Smith's Activities of Daily Living Questionnaire. Ironically, in this same questionnaire, Mr. Smith described that he has trouble sleeping, hears voices, and see things that are not actually present. Record at 180-81. Yet the ALJ never mentioned these facts in his activities of daily living analysis. Thus, the ALJ failed to adequately discuss, in accord with the SSR 96-7p factors, Mr. Smith's daily activities and explain whether they could be consistent with his ability to work.

---

[1] In *Bjornson*, the Seventh Circuit also found that failure to recognize these differences is a recurrent and deplorable feature of ALJ opinions in Social Security disability cases. *Id.* at 647.

Because the ALJ did not adequately articulate his credibility determinations, this Court is unable to ascertain exactly what the ALJ's reasons were for finding Mr. Smith's testimony incredible, and whether these reasons were adequate and reliable. In short, the ALJ's articulation does not afford meaningful review.

2.   The Weight Given to the Treating Psychiatrist's Opinion

Mr. Smith next contends that the ALJ failed to properly evaluate the opinion of Dr. Navakus, his treating psychiatrist. This Court agrees that the ALJ's rejection of Dr. Navakus' opinion was improper.

In general, a treating physician's opinion that is consistent with the record is entitled to controlling weight.   20 C.F.R. § 404.1527(d)(2); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010).   Even if the ALJ finds that the opinion is not entitled to controlling weight, he may not simply dismiss it out of hand.   SSR 96-2p.   Rather, an ALJ who chooses to reject a treating physician's opinion must provide a sound explanation for the rejection.   20 C.F.R. § 404.1527(d)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).   He must evaluate the opinion's weight by looking at the length, nature and extent of the plaintiff's and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency

with the record as a whole; whether the doctor is a specialist; and "other factors." 20 C.F.R. § 404.1527(d). Additionally, when an ALJ decides to favor another medical professional's opinion over that of a treating physician, the ALJ must provide an account of what value the treating physician's opinion merits. *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir.2011).

Here, it does not appear that the ALJ weighed the merits of Dr. Navakus' opinion, let alone engaged in the careful analysis required by the regulations and case law. Dr. Navakus assessed Mr. Smith on numerous occasions, as reflected in the medical records and accompanying progress notes. Therefore, his opinions as to Mr. Smith's symptoms and residual functional capacity were highly relevant to several parts of the ALJ's analysis. However, the ALJ limited his comments regarding Dr. Navakus' treatment to the following:

> In regards to the medical opinion that claimant suffered from schizophrenia, the undersigned finds that the Will County progress notes, which indicated that the claimant suffered from schizophrenia is without substantial support from other evidence in the record, which obviously renders it less persuasive. . . . [t]he treatment report failed to mention evidence of delusions or hallucinations and it appears that the claimant's symptoms were reported as well controlled with medications.

The ALJ ultimately rejected Dr. Navakus' opinion, finding that his treating records failed to line up with his assessment and

that this assessment also contradicted a previous evaluation that Dr. Baukus performed.

Initially, the ALJ failed to explain why, in his view, Dr. Baukus' opinion was inconsistent with Dr. Navakus' findings. During his mental status examination on May 18, 2006 with Dr. Baukus, Mr. Smith reported symptoms of depression, including loss of interest in almost all activities; sleep disturbance; decreased energy; feelings of guilt and worthlessness; difficulty concentrating; and thoughts of suicide. Record at 297. He also reported feeling pain all over and severe headaches. *Id.* Dr. Baukus noted that Mr. Smith's emotional tone had a variable range with moderate amplitude. *Id.* at 298. He was also easily moved to tears when talking about his penitentiary sentence. *Id.* He was unable to name five large cities in 30 seconds. *Id.* He had difficulty performing serial sevens and was not able to make any calculations within 30 seconds. *Id.* He was not able to multiply single digits, and his abstract thinking was inadequate. *Id.* Dr. Baukus concluded that Mr. Smith was incapable of managing his own funds. *Id.*

Dr. Baukus' impressions were in no way inconsistent with Dr. Navakus' assessments. Mr. Smith began seeing Dr. Navakas on September 28, 2006. At that initial appointment, he similarly complained of depression, suicidal thoughts, lack of sleep,

isolation, and visual and auditory hallucinations. Record at
389. Dr. Navakus eventually diagnosed Mr. Smith with
schizophrenia. *Id.* He also opined that Mr. Smith could not
meet competitive standards in the following areas: sustaining an
ordinary routine without special supervision; working in
proximity to others without being unduly distracted; accepting
instructions and responding appropriately to criticism from
supervisors; getting along with co-workers or peers without
unduly distracting them or exhibiting behavioral extremes;
dealing with normal work stress; and generally interacting with
the public and maintaining socially appropriate behavior. Record
at 395-96.

The ALJ never pointed to anything in Dr. Baukus' opinion
that was inconsistent with Dr. Navakus' evaluation. In fact,
both of the doctors' evaluations suggest that Mr. Smith's
ability to work was significantly compromised. Mr. Smith
consistently reported depression, suicidal thoughts, lack of
sleep, isolation, and hallucinations. Therefore, the ALJ either
misread Dr. Navakus' reports or ignored them completely in
concluding that there were inconsistencies.

Moreover, even if the ALJ had identified some
inconsistencies, he failed to explain why Dr. Baukus' single
assessment trumped the opinion of Dr. Navakus, the psychiatrist

who treated Mr. Smith for nearly two years. Dr. Navakus started seeing Mr. Smith in September 2006, four months after Dr. Baukus' one-time mental evaluation. Therefore, the ALJ's assertion that Dr. Navakus' opinion "contradicted" Dr. Baukus' prior opinion is without merit, as Mr. Smith's mental condition could have changed by the time he started seeing Dr. Navakus. After all, the record demonstrates that Mr. Smith attempted suicide after he met with Dr. Baukus, but before he met with Dr. Navakus. Record at 355. Dr. Navakus' evaluation represented the most current assessment of Mr. Smith's mental condition, and it was grounded in the doctor's substantial and repeated interaction with Mr. Smith. The ALJ, thus, failed to provide a proper basis for rejecting Dr. Navakus' well-informed, consistent opinion.

The ALJ also rejected Dr. Navakus' opinion that Mr. Smith was incapable of performing even unskilled, simple jobs. He found that Dr. Navakus' evaluation contradicted his treating records, which he believed demonstrated improvement in Mr. Smith's condition over time. This conclusion is not supported by substantial evidence in the record.

Dr. Navakus' treatment notes indicate that, although Mr. Smith reported that he was "doing a little better" or "had a good six weeks," he was still hearing things, isolating himself, and feeling lonely. Record at 386. He was also incarcerated in

February 2008 for "snapping off" at his sister. Record at 381. However, the ALJ failed to mention these details, although they were well detailed in Dr. Navakus' treatment notes. Accordingly, the ALJ failed to sufficiently explain how Dr. Navakus' treatment notes were inconsistent with his assessment, where the ALJ omitted discussion about the treatment notes' full content. The ALJ was incorrect to conclude that nothing in the record supported Dr. Navakus' opinion, because although there were better and worse days throughout the course of Mr. Smith's treatment, the worse days could affect his ability to hold a job.

Without adequate analysis and explanation, the ALJ's rejection of Dr. Navakus' opinion was not supported by substantial evidence. Dr. Navakus' evaluation is consistent with his treatment notes and Dr. Baukus' one-time evaluation. Therefore, the ALJ erred in failing to articulate the consideration he gave to Dr. Navakus' opinion.

### 3. The ALJ's Findings Related to Deficiencies in Concentration, Persistence, or Pace

Finally, Mr. Smith contends that the ALJ did not properly account for his moderate impairments in concentration, persistence, or pace. Specifically, Mr. Smith argues that the ALJ erred in failing to explain how he would be capable of performing unskilled work, considering his impairments.

The ALJ did not explain the bases for his conclusion that

30

Mr. Smith has the residual functional capacity to perform light work. Rather the ALJ merely listed Mr. Smith's daily activities-- namely, his church attendance, his capability to perform light chores, and his ability to relate well to his family-- as substantial evidence that he can perform light, unskilled work. This is insufficient because a claimant's minimal daily activities do not establish that he is actually able to engage in substantial physical activity. *See Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). *See also Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) (cautioning the Commissioner against placing undue weight on claimant's household activities in assessing the claimant's ability to hold a job outside the home); *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) (finding that the ALJ's questioning of claimant about his ability to prepare meals, make his bed, clean his apartment, take walks, and shop for groceries ignored *how* he carried out those activities). Finally, because responses to the demands of work are highly individualized, "the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job." SSR 85-15; *see also Craft*, 539 F.3d at 677-78.

On the record before it, the Court cannot say that the ALJ's finding that Mr. Smith has the residual functional capacity to perform light work is supported by substantial evidence,

especially where the ALJ's decision rested solely on Mr. Smith's ability to perform very basic household activities.

## C.  CONCLUSION

For the reasons set forth above, the Court finds that meaningful review is not possible because the ALJ failed to adequately articulate his bases for discounting Mr. Smith's credibility and for rejecting Mr. Smith's treating psychiatrist's opinion.  Additionally, the ALJ failed to explain how Mr. Smith would be capable of performing unskilled work, considering his mental and physical impairments.  Accordingly, the Court grants Mr. Smith's motion for summary judgment [#19]; this matter is remanded for further proceedings consistent with this opinion.

Date: April 25, 2012

E N T E R E D:

ARLANDER KEYS
UNITED STATES MAGISTRATE JUDGE